# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1016V

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                      *    Chief Special Master Corcoran
                                      *
DAVID LIND,                           *
                                      *    Filed: February 17, 2026
              Petitioner,             *
                                      *
        v.                            *
                                      *
SECRETARY OF HEALTH AND               *
HUMAN SERVICES,                       *
                                      *
              Respondent.             *
                                      *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Kathleen Loucks,* Lommen Abdo Law Firm, Minneapolis, MN, for Petitioner.

*Nathaniel Trager,* U.S. Department of Justice, Washington, DC, for Respondent.

## ENTITLEMENT DECISION[1]

On August 19, 2022, David Lind filed a petition for compensation under the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C. §§ 300aa-10 et seq. ("Vaccine Act").[2] Petitioner alleges that as a result of receiving an influenza ("flu") vaccine on September 23, 2020, he developed Chronic Pain Syndrome and/or Chronic Fatigue Syndrome ("CFS"). *See* Petition at 1.

The parties agreed this matter could be appropriately resolved on the basis of the filed and written record, and have offered briefs in support of their respective positions. Petitioner's Motion for Ruling on the Record, dated January 15, 2025 (ECF No. 46) ("Mot."); Respondent's

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

Opposition, dated June 18, 2025 (ECF No. 52) ("Opp."); Petitioner's Reply, dated August 13, 2025 (ECF No. 57) ("Reply"). Now, for the reasons set forth below, I deny entitlement.

I.      **Fact History**

*Pre-Vaccination History*

Petitioner's pre-vaccination history includes a wide variety of comorbidities, including mental and physical conditions he was treated for that were thought to have caused pain, impacted his vigor, and/or detracted from his ability to concentrate. Ex. 4 at 8, 12, 25, 73, 217. These include autism spectrum disorder, posttraumatic stress disorder ("PTSD"), dysthymic disorder, attention deficit hyperactivity disorder ("ADHD"), hyperlipidemia, diabetes mellitus, painful peripheral neuropathy, sleep apnea, and a mild traumatic brain injury with associated headaches, neck pain, and aphasia. *Id.* at 144, 10, 322, 183, 191, 1300; Ex. 3 at 1. Petitioner's apnea was thought to be associated with fatigue, hypertension, and obesity. Ex. 4 at 355.

Petitioner was prescribed medications for his ADHD and depression. *See* Ex. 4 at 217. In January 2016, he was treated for memory and focus issues, and was diagnosed with chronic tension headaches, temporo-mandibular joint disorder (a chronic facial pain condition), post-concussion syndrome, insomnia, and PTSD. *Id.* at 8, 12. That same month, a neuropsychologist saw Mr. Lind and proposed that his symptoms (including aphasia, difficulty with planning, and poor concentration) could be attributable to severe emotional distress, adding that diagnostic testing supported diagnoses of chronic anxiety and depression. *Id.* at 25.

In November 2017, Petitioner underwent a gallbladder removal that resulted in residual pain weeks after surgery. Ex. 5 at 241–42, 832–33. Petitioner also was diagnosed in late 2019 with a lesion of his right ulnar nerve and right wrist pain, which he attributed to protecting his dog from a dog fight, and a sprain in his left ring finger, which (in occupational therapy) were later attributed to a repetitive stress injury from drumming. Ex. 4 at 602, 684. And throughout 2018 into April 2019, Petitioner repeatedly reported fatigue to his psychiatrist, family doctor, and dermatologist. *See id.* at 217, 222–23, 236, 296, 318–19, 471.

*Receipt of Subject Vaccine and Subsequent Symptoms*

On September 23, 2020, Mr. Lind was administered a flu vaccine at HealthPartners Hills Family Practice ("AHFP") in Arden Hills, MN. Ex. 1 at 2. Eight days later (October 1, 2020), Petitioner had a telemedicine consultation at AHFP with family medicine physician Michael Stiffman, M.D. Ex. 4 at 813. Petitioner reported post-vaccination headaches, muscle pain, lethargy, and weakness, adding that while he had experienced comparable symptoms after vaccination, they seemed to have lasted longer this time. *Id.* Dr. Stiffman deemed Petitioner's myalgias and other

complaints to be "likely an immune reaction to the influenza vaccine," and he proposed testing for a COVID-19 infection. *Id*.

On October 6, 2020, Petitioner returned to Dr. Stiffman with complaints of body aches, muscle pain, and joint pain. Ex. 4 at 823. He again reported that his symptoms had begun after his September vaccination, and included "myalgias and arthralgias – [in his] shoulders, chest, ankles, [and] knees." *Id*. at 824. A physical exam yielded normal findings, and it was also noted that Petitioner had tested negative for a COVID-19 infection. *Id*. but Dr. Stiffman diagnosed Petitioner with "severe myalgias and arthralgias" beginning after vaccination (although this record does not include speculation that the two were linked). *Id*. at 825.

Later that same month, Petitioner was referred by a different treater to a rheumatologist for his ongoing complaints of lethargy, weakness, aches, and pains in his joints and muscles. Ex. 4 at 851. A tapering course of prednisone was prescribed, and Petitioner underwent an extensive lab workup, which revealed normal findings. *Id*. Petitioner also at the end of October informed psychiatric treaters that he had developed persistent aches and pains within hours of his September 23, 2020, vaccination, although it was noted at this time that his inflammatory marker testing did not reveal concerns. *Id*. at 867.

On November 20, 2020, Mr. Lind saw Dr. Eric Miller at HealthPartners Rheumatology Clinic for evaluation of diffuse arthralgias and myalgias, fatigue, and headaches. Petitioner again reported a post-vaccination onset of symptoms beginning within a few hours of vaccination. Ex. 4 at 874. In the write-up for this visit, Dr. Miller deemed Petitioner's clinical history to be "unusual for inflammatory arthritis, ANA-related disease, myositis, [and] vasculitis." *Id*. at 873. But Dr. Miller noted a "clear association" with the vaccination, albeit one based on Petitioner's self-reporting symptoms onset. *Id*. Dr. Miller's differential diagnosis included myalgia and fatigue, and he increased petitioner's dose of prednisone. *Id*.

*Subsequent Pain Management Treatment*

The next month (on December 10, 2020), Mr. Lind had a telemedicine visit with Dr. Alfred Clavell at Anoka Pain Management ("Anoka"). Ex. 4 at 896. Petitioner noted he generally had been experiencing pain, headaches, and fatigue for three months. *Id*. at 897. He also noted that his previous complaints of intractable headaches had improved following resolution of his pending workers' compensation cases. *Id*. at 898. But he noted as well that within the eleven weeks that had passed since his vaccination, he was experiencing myalgias "and pain and foggy headed," and that he "can't organize thoughts." *Id*. Dr. Clavell deemed Petitioner's history to be "consistent with early phase of chronic fatigue syndrome vs. fibromyalgia." *Id*. at 901. Dr. Clavell diagnosed Petitioner with myalgia at multiple sites and referred him to clinical health psychology and physical therapy ("PT"). *Id*.

3

At the end of December 2020, Petitioner had his first telemedicine visit at Anoka with psychologist Georgia Panopoulos, Ph.D., L.P. He reported a long history of "problems and impairments due to pain" that included being on social security disability insurance for the prior two years. Ex. 4 at 914–15. At a return visit on January 14, 2021, he "made a connection pain in his shoulder and past trauma/traumatic memories." *Id*. at 936. There was no mention of Petitioner's flu vaccine, or pain related to the flu vaccine at this appointment. Petitioner subsequently had numerous additional visits with Dr. Panopoulos, through the end of 2022.[3] He was noted to have been diagnosed with "pain [disorder] associated with psychological factors and a general medical condition (chronic pain disorder)." *See*, *e.g., id* at 936; *see also id.* at 915, 984, 1006. Over the course of seeing Dr. Panopoulos, Petitioner's reported progress trended towards improvement, with Petitioner generally claiming his progress towards his goals were good, he was increasing his physical activity, and his pain and emotional state remained stable. *Id.* at 915, 936, 984, 1006, 1020, 1101, 1114, 1171; *but see id.* at 1161 (Petitioner relayed consistent improvements or stability in mood and pain until his May 13, 2021, visit where he stated that his pain and emotional state had worsened since his April 29, 2021, visit.).

### *Treatment in 2021 and Thereafter*

On January 8, 2021, Mr. Lind initiated PT with NovaCare Rehabilitation for a "chronic pain condition [which] contributed to myalgia following [his flu] vaccine." Ex. 6 at 7. He attended 32 visits through late October 2021, by which time he had been deemed to have met his goals, with a fair future prognosis. *Id.* at 122, 124. No other medical records filed in this case bear on resolution of causation.

## II.    Experts

A.    <u>Petitioner's Expert – Dr. Marcel Kinsbourne</u>[4] – Dr. Kinsbourne, a pediatric neurology specialist, prepared a single report in support of Petitioner's claim. Report, dated Sep. 12, 2023, filed as Ex. 10 (ECF No. 28-1) ("Kinsbourne Rep."). He opined that Mr. Lind experienced CFS due to the flu vaccine he received in September 2020.

Dr. Kinsbourne was board certified in pediatrics. *See* Curriculum Vitae, dated Sep. 14, 2023, filed as Ex. 11 (ECF No. 28-2) ("Kinsbourne CV") at 1. He received his medical degree in

---

[3] *See id* at 915, 936, 984, 1006, 1020, 1101, 1114, 1161, 1171, 1180, 1219, 1282, 1307, 1310, 1330, 1346, 1362, 1367, 1370, 1382, 1385, 1395, 1408, 1411, 1414, 1417, 1429, 1432, 1435, 1438, 1441, 1444, 1447, 1450, 1453, 1456, 1459, 1462, 1465, 1467, 1469, 1472, 1475; Ex. 7 at 36, 49, 61, 158, 177, 190, 203, 261; Ex. 20 at 61.

[4] Dr. Kinsbourne passed away during the pendency of this matter (as noted below). He was an erudite, courteous, and committed expert advocate for Program claimants for many years.

England, and was licensed to practice medicine in North Carolina since 1967. *Id.* From 1967 to 1974, Dr. Kinsbourne served as an associate professor in pediatrics and neurology and a senior research associate at Duke University Medical Center before holding a series of academic positions, including professorships in pediatrics, neurology, and psychology. *Id.* at 1–2. His clinical experience included serving as a senior staff physician in Ontario from 1974–1980, and a clinical associate in neurology at Massachusetts General Hospital from 1981–1991, although (as noted in other cases) many years had passed since he regularly saw patients. *See, e.g.*, *Strong v. Sec'y of Health & Hum. Servs.*, No. 15-1108V, 2018 WL 1125666, at \*6 (Fed. Cl. Spec. Mstr. Jan. 12, 2018); *McCollum v. Sec'y of Health & Hum. Servs.,* No. 14-790V, 2017 WL 5386613, at \*6 (Fed. Cl. Spec. Mstr. Sep. 15, 2017); *Pope v. Sec'y of Health & Hum. Servs.,* No. 14-078V, 2017 WL 2460503, at \*8 (Fed. Cl. Spec. Mstr. May 1, 2017). He authored over 400 peer-reviewed articles over the course of his practice relating to pediatrics and neurology. Kinsbourne CV at 5–33. Dr. Kinsbourne had not personally studied the immunologic issues raised by theories claiming vaccine causation (although his general neurologic expertise rendered him competent to discuss such matters).

Dr. Kinsbourne's report began with a summary of Petitioner's medical history. Kinsbourne Rep. at 1–4. He acknowledged, and even reviewed, Petitioner's ample pre-vaccination history of conditions that at least facially could have some relationship to his CFS, but denied they in fact were related. *Id.* at 1–2, 4.

CFS, Dr. Kinsbourne noted, is "characterized by fatigue lasting more than six months," plus muscle and joint pain, and is not relieved by rest, leading to constant debilitation. Kinsbourne Rep. at 4. Its diagnosis requires evidence of new onset (without lifelong occurrence) not linked to exertion, and which features persistent/relapsing chronic symptoms. K. Fukuda et al., *The Chronic Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study*, 121 Annals of Internal Medicine 953, 956 (Dec. 15, 1994), filed as Ex. 14 (ECF No. 28-5) ("Fukuda"). In addition, at least four of eight other symptoms must have been experienced during six or more months of illness, but *predate* the resulting fatigue—memory impairment/concentration limits; sore throat; tender lymph nodes; muscle pain; joint pain without swelling/redness; new pattern headache; unrefreshing sleep; and post-exertional malaise lasting more than a day. Kinsbourne Rep. at 4–5; Fukuda at 956.

Dr. Kinsbourne proposed that CFS could be attributed to "central sensitization"—which he noted features persistent pain and other symptoms, despite treatment and in the absence of evidence of inflammation. Kinsbourne Rep. at 5 (discussing A. Trouvin & S. Perrot, *New Concepts of Pain*, 33 Best Practices and Research Clinical Rheumatology 245, 249 (June 2019) ("Trouvin

& Perrot")).[5] Centralized sensation is defined as the "[i]ncreased responsiveness of nociceptive[6] neurons in the central nervous system." Trouvin & Perrot at 249. Trouvin & Perrot outlined central sensitization as a new classification of musculoskeletal pain based on studies on rheumatoid pain that showed many patients continued to experience pain after receiving treatment for their musculoskeletal conditions. *Id.* In effect, Dr. Kinsbourne proposed, central sensitization reflects exaggeration and amplification of sensory stimuli, leading them to "feel" painful due to a hyperexcited state that persists even without obvious stimuli. Kinsbourne Rep. at 6; M. Volcheck et al., *Central Sensitization, Chronic Pain and Other Symptoms: Better Understanding, Better Management*, 90 Cleveland Clinic Journal of Medicine 245, 247 (2023), filed as Ex. 18 (ECF No. 28-9) (CFS reflects a "trifecta" of hyperalgesia (painful stimuli become associated with additional pain), allodynia (exaggerated sensitivity to otherwise non-painful stimuli), and global sensory hyperresponsiveness to both external and internal stimuli). There is also a psychosomatic aspect of CFS, in which "[p]ain catastrophizing and depression attend pain in CFS." Kinsbourne Rep. at 6.

Mr. Lind clearly met the diagnostic criteria for CFS, Dr. Kinsbourne maintained. Kinsbourne Rep. at 5. To substantiate this contention, Dr. Kinsbourne relied on post-vaccination evidence of Petitioner's subjective complaints, as well as self-reporting contained in Petitioner's witness statements. *Id.* at 2–4. Dr. Kinsbourne also disclaimed Petitioner's prior comorbidities or conditions as explanatory, deeming them (in a somewhat conclusory fashion) not "severe enough to explain the recorded signs and symptoms," or "either stable or treated and controlled." *Id.* at 5.

The pathophysiology of CFS is, Dr. Kinsbourne maintained, "not known," but he contended (albeit without offering independent evidence in support) that it is "frequently triggered by infections and vaccinations." Kinsbourne Rep. at 5. Central sensitization likely occurred because of a "prolonged increase in the excitability of neurons in central nociceptive pathways," uncoupled from the impact of a particular peripheral stimuli. *Id.* at 6; A. Latremoliere & C. Woolf *Central Sensitization: A Generator of Pain Hypersensitivity by Central Neuro Plasticity*, 10 J. Pain 895, (2009), filed as Ex. 15 (ECF No. 28-6). It was also possible that "[u]nderlying, nitrogen and oxidative stress" that result in "lowered pressure pain therapy in major muscles" contribute to the process, explaining why CFS feelings of fatigue or pain increase after exercise. Kinsbourne Rep. at 6.

---

[5] While the article by Trouvin & Perrot is referenced and discussed in Dr. Kinsbourne's expert report, the article does not appear to have been filed as an exhibit in this matter.

[6] Nociceptive is the adjective form of the noun "Nociceptor," which is defined as "a receptor for pain caused by injury to body tissues; the injury may be from physical stimuli such as mechanical, thermal, or electrical stimuli, or from chemical stimuli such as the presence of a toxin or an excess of a nontoxic substance." *Nociceptor,* Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=34163&searchterm=nociceptor (last visited Feb. 11, 2026).

Thus, CFS likely reflects the concurrent presence of three factors:

1.      Hyperexcitability of the cell membrane of central neurons, decreased action Potential threshold, synaptic strength, decreased descending inhibitory Transmission, reduced activation threshold, and enlarged receptive Fields.

2.      Heightened functional activity within the somatosensory cortex (sensory processing), insula (emotional context of sensation, sensory appraisal), and amygdala (mood processing).

3.      Hyperactive sympathetic nervous system and endogenous opioid system.

Kinsbourne Rep. at 7. Dr. Kinsbourne did not, however, identify a source for this list of factors. At most, he offered a study observing "a significant reduction in white matter volumes" in parts of the brains of CFS patients, thus underscoring that there was a "role of central neural mechanisms" in CFS's onset. *Id.*; T. Yang et al., *The Clinical Value of Cytokines in Chronic Fatigue Syndrome*, 17 J. Translational Medicine 213, 219 (2019), filed as Ex. 19 (ECF No. 28-10) ("Yang").

Dr. Kinsbourne next endeavored to show how the immune system's response to vaccination could create the circumstances necessary for CFS. Kinsbourne Rep. at 7–9. Patients with CFS had been confirmed in studies to experience "highly attenuated" responses of a class of T helper cell responsible for encouraging the production of certain cytokines, leading to an "inflammatory milieu." *Id.* at 7; G. Broderick et al., *A Formal Analysis of Cytokine Networks in Chronic Fatigue Syndrome,* 24 Brian, Behavior and Immunity 1209 (2010), filed as Ex. 12 (ECF No. 28-3) ("Broderick"). Thus, the neural changes likely at the center of CFS reflected central nervous system inflammation. Yang at 219.

Vaccines, Dr. Kinsbourne maintained, could cause an immediate overproduction of proinflammatory cytokines right after being administered. Kinsbourne Rep. at 7. Alternatively, "repeated exposure to an initially subthreshold stimulus" (presumably receipt of a vaccine an individual had been exposed to in the past) could trigger "kindling" of persistent hypersensitivity. *Id.* Because of Petitioner's pre-vaccination history, he was susceptible to such kindling (although this argument somewhat runs contrary to Dr. Kinsbourne's prior denial that Petitioner's preexisting conditions related to his CFS). *Id.* Dr. Kinsbourne did not explicitly set forth, however, why vaccination would trigger this overstimulation (although reading his report in the most generous light possible suggests he would contend the cytokine upregulation attributable to vaccination was the trigger).

7

Another possible mechanism for how vaccination could spark CFS, Dr. Kinsbourne contended, was simply the amplification of Petitioner's underlying levels of stress. Kinsbourne Rep. at 7–8. That stress would be enough to send the immune system "into a chronic state of persisting subthreshold inflammation. *Id.* at 7; K. Louati & F. Berenbaum, *Fatigue in Chronic Inflammation – A link to Pain Pathways*, 17 Arthritis Research & Therapy 254, 256 (2015), filed as Ex. 16 (ECF No. 28-7). In such a state of persistent, if low-lying, inflammation, cytokines prompted by vaccination could impact the kind of "nociceptive" pain characteristic of CFS. Kinsbourne Rep. at 8.

Dr. Kinsbourne also proposed that the temporal relationship between Petitioner's onset of CFS symptoms (which he concluded began within hours of vaccination) was medically acceptable. Kinsbourne Rep. at 4–5, 9. He emphasized the close timing of Petitioner's symptoms to the vaccination as suggestive of a causal relationship, and also observed treater opinions that at least Petitioner's initial symptoms might reflect vaccine-associated malaise. *Id.* at 5. In that short initial timeframe, "the body's overproduction of pro-inflammatory cytokines" would occur rapidly, leading to symptoms. *Id.* at 7.

B.    <u>Respondent's Expert – Dr. Roland Staud</u> - Dr. Staud is a rheumatologist, and he prepared a single written report responding to Dr. Kinsbourne's opinion. Report, dated January 5 2024, filed as Ex. A (ECF No. 31-1) ("Staud Rep.").

Dr. Staud earned his medical degree from Freie Universität in Berlin in 1972. Curriculum Vitae, dated Jan. 29, 2024, filed as Ex. B (ECF No. 31-2) ("Staud CV") at 1. After earning his degree, he underwent two Internal Medicine residencies: one at Klinikum Charlottenburg of Freie Universität, Berlin, Germany, and the second at Englewood Hospital located in Englewood, NJ where he served as the Chief Resident. *Id.* After completing his residency at Englewood Hospital, he underwent a Fellowship in Rheumatology at New York University. *Id.* Dr. Staud is board certified in Rheumatology and Internal Medicine, and treats patients with rheumatological conditions and musculoskeletal disorders, like CFS. *Id.*; Staud Rep. at 1. Dr. Staud currently serves as the director of the Center for Chronic Musculoskeletal Pain and Fatigue Research at the University of Florida, and has authored over 200 peer-reviewed articles on topics relating to Rheumatology and Internal Medicine. Staud CV at 4–21; Staud Rep. at 1. Over the course of Dr. Staud's practice, he has treated many patients with CFS and other chronic musculoskeletal disorders in his clinic, including rheumatoid arthritis, systemic lupus erythematosus, Sjogren's syndrome, vasculitis, inflammatory myopathies, and chronic musculoskeletal disorders, including fibromyalgia, complex regional pain syndrome, postural orthostatic tachycardia syndrome, and myalgic encephalomyelitis, and systemic exercise intolerance disease. *See* Staud CV at 1; Staud Rep. at 1.

Like Dr. Kinsbourne, Dr. Staud performed a records review inclusive of Petitioner's pre and post-vaccination treatment history, including a summary of it his report. *See generally* Staud Rep. at 2–8. Dr. Staud observed that pre-vaccination, "[P]etitioner had been diagnosed with a large number of chronic medical conditions associated with pain, fatigue, and decreased physical and cognitive functioning," that many of his conditions had been diagnosed up to six years before, and that he had made an application for social disability in 2018 as a result of his medical issues. *Id.* at 9. Those preexisting conditions, however, were more likely explanatory of Petitioner's post-vaccination symptoms, which Dr. Staud felt were better characterized as PTSD or dysthymia[7]— either of which had at their core a "strong emotional component." *Id.* Dr. Staud thus rejected the CFS diagnosis embraced by Dr. Kinsbourne, as well as the contention the flu vaccine had caused it.

CFS, Dr. Staud explained, has existed as a diagnostic classification since the late 1980s, replacing what was once referred to as "Epstein-Barr virus syndrome." Staud Rep. at 11. He noted that revisions to the diagnostic criteria have occurred over time, as medical understanding of CFS evolved, adding that as of 2015 the National Academy of Medicine had updated the criteria to include three primary elements:

(1)     A substantial reduction or impairment in the ability to engage in pre-illness levels of activity, persisting for more than six months and accompanied by significant fatigue that is not due to exertion and that cannot be ameliorated with rest;

(2)     Post-exertional malaise (which can cause symptoms relapse and can even occur simply as the result of sensory overload); and

(3)     Unrefreshing sleep.

Institute of Medicine, *Beyond Myalgic Encephalomyelitis/Chronic Fatigue Syndrome: Redefining an Illness*, 145–46 (Nat'l Academies Press 2015), filed as Ex. 23 (ECF No. 42-1) ("IOM CFS Report"). In addition, two manifestations of cognitive impairment or orthostatic intolerance (worsening of symptoms in response to change in posture/body position, and reflected in evidence of blood pressure or heart rate fluctuations) must be established. Staud Rep. at 12–13.

---

[7] Dysthymic disorder, also referred to as dysthymia, is defined as "a mood disorder characterized by depressed feeling (sad, blue, low), loss of interest or pleasure in one's usual activities, and by at least some of the following: altered appetite, disturbed sleep patterns, lack of energy, low self-esteem, poor concentration or decision-making skills, and feelings of hopelessness. Symptoms have persisted for more than 2 years but are not severe enough to meet the criteria for major depressive disorder." *Dysthymic Disorder*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=71106 (last visited Feb. 11, 2026).

Dr. Staud opined that Petitioner could not be properly diagnosed with CFS. Staud Rep. at 16. First, the aforementioned criteria do not appear from the records to have been applied to Petitioner's presentation. Second, the actual clinical findings when Petitioner was examined did not meet the criteria. Thus, there was no well documented evidence of post-exertional malaise. *Id.*

In Dr. Staud's understanding, CFS is a "multifactorial condition," with a number of integrated and overlapping pathogenic features/causes. Staud Rep. at 13. But he allowed that studies had identified some role for a "disturbance in immunity" for CFS patients, although those immune irregularities involved possible cytokine profile alteration (with higher levels of proinflammatory cytokines), decrease in function of some kinds of nonspecific immune cells, and a heightened role for other T cells. M. Maes et al., *Myalgic Encephalomyelitis (ME), Chronic Fatigue Syndrome (CFS), and Chronic Fatigue (CF) are Distinguished Accurately: Results of Supervised Learning Techniques Applied on Clinical and Inflammatory Data*, 200 Psychiatry Research 754, 758–59 (2012), filed as Ex. A-28 (ECF No. 33-8). Nevertheless, Dr. Staud maintained that the flu vaccine was not itself reliably linked to CFS, even if an aberrant immune response was likely responsible for some of its symptoms. Staud Rep. at 13–14. In so contending, Dr. Staud began by comparing CFS to fibromyalgia, a "chronic musculoskeletal disorder of widespread pain." *Id.* at 13.[8]

There are, Dr. Staud noted, some "observational research studies" speculating that fibromyalgia may be related to infections, but support for that conclusion was not robust—and studies looking at other possible external triggers (for example, motor vehicle accidents) not only generated weak results, but even suggested that the symptoms often preceded the proposed adverse trigger. G. Jones et al., *Role of Road Traffic Accidents and Other Traumatic Events in the Onset of Chronic Widespread Pain: Results from a Population-Based Prospective Study*, 63 Arthritis Care & Research 696, (2011), filed as Ex. A-35 (ECF No. 33-15). At most, single case reports (which relied on the general proposition that "trauma or adverse reactions to vaccines cause[] 'stress'") existed, but are a poor kind of causation evidence. Staud Rep. at 13; J. Ablin et al., *Fibromyalgia, Infection and Vaccination: Two More Parts in the Etiological Puzzle,* 27 J. Autoimmunity 145, 149 (2006), filed as Ex. A-37 (ECF No. 33-17). Rather, reliable evidence suggested these kinds of chronic pain conditions were attributable to central nervous system dysfunction, but little good evidence linked vaccination to initiating that process. R. Harris et al., *Pregabalin Rectifies Aberrant Brain Chemistry, Connectivity, and Functional Response in Chronic Pain Patients*, 119 Anesthesiology 1453, 1463–64 (2013), filed as Ex. A-40 (ECF No. 33-20).

---

[8] Dr. Staud's report also included a discussion of fibromyalgia as an alternative diagnosis for Petitioner. Staud Rep. at 9–11. But Petitioner almost wholly seems to have contended in briefing his claim that his injury was CFS. Mot. at 17–20. And Dr. Staud seems to have used it as an analog for explaining why vaccination was not likely to cause this kind of presentation. I therefore do not include a discussion of the nature of fibromyalgia, or whether it fits diagnostically with the medical record (although I have included some discussion of Dr. Staud's comparison of CFS to fibromyalgia as both featuring widespread complaints of pain and fatigue).

The evidence in this case, in Dr. Staud's opinion, better supported the conclusion that Mr. Lind's condition was attributable to one of Petitioner's previously-diagnosed mental conditions, like PTSD. Staud Rep. at 14–15. PTSD is a well-accepted psychiatric disorder that has "consistently been associated with general health symptoms and medical conditions," including "self-reported somatic symptoms or . . . chronic medical conditions," with the same kind of physical complaints reported by Petitioner. *Id.*; P. Schnurr & M. Jankowski, *Physical Health and Post-Traumatic Stress Disorder: Review and Synthesis*¸ 4 Seminars in Clinical Neuropsychiatry 295, (Oct. 1999), filed as Ex. A-44 (ECF No. 34-4). And PTSD can be effectively treated with cognitive behavioral therapy. Staud Rep. at 15.

Here, Petitioner's medical history reveals persistent mental and physical concerns long before his September 2020 vaccination, and which were affirmatively diagnosed and treated. Staud Rep. at 16. Several of Petitioner's pre-vaccination conditions (PTSD, autism, ADHD, dysthymia/long-term depression, etc.) are themselves associated with chronic fatigue/chronic pain. While Petitioner reported post-vaccination symptoms, they were intermittent/waxing and waning. And ultimately the most effective treatment appeared to be from his visits with Dr. Panopoulos, who saw Petitioner numerous times, and whose treatment records establish Petitioner's improving condition. *Id.*; Ex. 4 at 1475.

### III.    Other Medical Literature

As noted below, after Dr. Kinsbourne's passing Petitioner was unable to retain a second expert to respond to Dr. Staud's criticisms. I therefore permitted Petitioner to file additional literature to support his causation theory, and he did so on December 13, 2024, before offering his brief in support of the claim. *See generally* ECF No. 42. (Petitioner later filed one additional item at the time of submission of his brief. *See* ECF No. 44-2).

Petitioner has offered ten items of literature in further support of his claim. I have reviewed all of them, and summarize those most relevant to my determination:

#### A.    *Articles on CFS Generally*

Some of the recently-filed items were identical to items Respondent filed, and pertain to how the medical community currently understands CFS. *See, e.g.*, IOM CFS Report. The IOM CFS Report does glancingly note that "immunizations" have previously been causally associated with CFS, although it deems CFS's causes still unknown. IOM CFS Report at 15.[9] It goes on to

---

[9] Petitioner also filed a document entitled "A Report of the CFS/ME Working Group" from 2002 (*see* Ex. 28 (ECF No. 42-6)) and it too also makes vague reference to the possibility that certain vaccinations might be associated with

note that CFS may involve immune dysregulation and/or autoimmunity (although it again notes the overall paucity of scientific studies into the subject matter). *Id.* at 151–52. The Report later discusses "early suspicion" that CFS could have an infectious etiology (the kind of possibility that would tend to support a contention that a vaccine could have the same effect). *Id.* at 157. However, it notes the only consistent findings of an association with an infection has been in connection with the Epstein-Barr virus—and makes no mention of an influenza infection as similarly-associated. *Id.* at 159–62.

B.      *Articles on Immune System Findings Relevant to CFS*

Several items filed relate to the portion of Dr. Kinsbourne's theory contending that CFS could be caused or encouraged by immune system aberrancy—in particular, cytokine upregulation (which vaccines are well-understood to cause, at least transiently, from their stimulation of the innate immune response). *See, e.g.*, S. Hardcastle et al., *Serum Immune Proteins in Moderate and Severe Chronic Fatigue Syndrome/Myalgic Encephalomyelitis Patients,* 12 Int. J. Med. Sci. 10:764 (2015), filed as Ex. 24 (ECF No. 42-2) ("Hardcastle"), 771 (cytokine abnormalities demonstrated in serum of CFS patients, with variable levels and kinds of cytokines present correlating with severity of disease). But these articles not only say nothing about what would cause CFS, they also did not evaluate *when* these cytokine levels were measured (and hence their presence could reflect more on the immune "picture" in the context of ongoing and active disease than in what triggers CFS in the first place).

Another article involved the propensity of the flu vaccine to impact "autonomic HRV [heart rate variability] response." S. Perring & E. Jones, *Assessment of Changes in Cardiac Autonomic Tone Resulting from Inflammation*, 32 Clin. Physiol. Funct. Im. 437 (2012), filed as Ex. 32 (ECF No. 42-10) ("Perring & Jones"). The Perring & Jones researchers measured heart rate and breathing responses in a sample of 71 patients who received a flu vaccine, and also looked more closely at a subset of 15 individuals who reported symptomatic responses to the vaccine for more than a day post-vaccination. *Id.* at 438. The subset of patients most impacted by what the study's authors deemed "a significant inflammatory response to the vaccination" also displayed a reduction in HRV response—consistent with the fact that "clinical conditions characterized by an increase in inflammatory markers" often also involve a comparable response. *Id.* at 441, 443. Perring & Jones does not directly involve CFS, however, and it does not consider whether a flu vaccine could *cause* a dysautonomic condition, through this impact on cardiac performance was thought to be attributable to vaccine-induced transient inflammation.

---

CFS. *See* Ex. 28 at 22, 38. The source of this publication is unclear, however, although it does appear it might have a UK origin (*see* Ex. 28 at 71–74).

C.       *Articles Involving CFS and Vaccines*

1.       E. Brenu et al., *The Effects of Influenza Vaccination on Immune Function in Patients With Chronic Fatigue Syndrome/Myalgic Encephalomyelitis,* 3 Int. J. Clin. Med. 544 (2012), filed as Ex. 26 (ECF No. 42-4) ("Brenu"). Brenu involved a small sample of *existing* CFS patients, comparing their serum after receiving a trivalent form of flu vaccine with a control group that did not have CFS. Brenu at 545. Brenu's authors did observe an increase in some kinds of T cells and cytokines (both pro and anti-inflammatory). *Id.* at 547–48. The study did not conclude, however, that the immune "hit" of vaccination was necessarily one likely to encourage worsening, and Brenu's authors noted that (a) CFS patients already were experiencing immune dysregulation, (b) the flu vaccine was understood to encourage initial symptoms congruent with what individuals with CFS experience, and (c) it may be more beneficial than harmful for CFS patients to receive the flu vaccine, even if there were risks in administering a vaccine to individuals already experiencing the effects of a compromised immune system. *Id.* at 548–49.

2.       O. Ortega-Hernandez & Y. Shoenfeld, *Infection, Vaccination, and Autoantibodies in Chronic Fatigue Syndrome, Cause or Coincidence?* Ann. N.Y. Acad. Sci. 1173:600 (2009), filed as Ex. 27 (ECF No. 42-5) ("Ortega-Hernandez"). Ortega-Hernandez is a review article commenting on the possibility that CFS is autoimmune in pathogenesis, noting its association with other autoimmune or infectious diseases, while also recognizing that "there is still a lack of evidence for designating CFS as an autoimmune phenomena." Ortega-Hernandez at 606. It specifically discusses a case report in which CFS occurring in a patient who had both received a hepatitis B vaccine and silicone breast implants suggested that the two "acted as specific adjuvants for the CFS onset," and that this in turn raised the possibility that autoantibodies could cause CFS (thus rendering it an autoimmune disease). *Id.* at 601, 606. Yet at the same time, Ortega-Hernandez *specifically* includes a table relying on other literature, and setting forth the demonstrated risk of CFS after different vaccines—with the flu vaccine proposed to pose *no risk*. *Id.* at 603 tbl. 2 ("[r]egarding immunization against influenza, vaccination appears to provide protective antibody levels without worsening CFS symptoms or causing excessive adverse effects"). Thus, although Ortega-Hernandez may include discussion about the overall context of vaccination bearing on causation herein, it does not support the primary element of Petitioner's theory.

3.       S. Lynch et al., *Chronic Fatigue and Swine Flu Vaccination,* Rapid Responses—the BMJ (21 March 2014), filed as Ex. 29 (ECF No. 42-7) ("Lynch"). Lynch discusses two case reports, in which individuals experienced CFS within two to three days of receipt of a swine flu vaccine (not identical to the flu vaccine at issue, although somewhat

13

comparable).[10] Lynch at 1–4. Lynch's authors do not propose there exists a "definite causal relationship" between CFS and this vaccine, however. *Id.* at 5.

4.      R. Gherardi et al., *Myalgia and Chronic Fatigue Syndrome Following Immunization: Macrophagic Myofasciitis and Animal Studies Support Linkage to Aluminum Adjuvant Persistency and Diffusion in the Immune System,* 18 Autoimm. Rev. 7:691 (2019), filed as Ex. 31 (ECF No. 42-9) ("Gherardi"). Gherardi is a review article proposing that CFS might not only be a vaccine-associated adverse event, but that it likely has as its pathologic mechanism something referred to as "autoimmune/inflammatory syndrome induced by adjuvants," or "ASIA"—a theory that the aluminum-based adjuvant contained in many vaccines can build up in the body, resulting in immune-mediated disease. Gherardi at 699. But the ASIA theory itself (which does not bear on a case involving a *non-adjuvanted* vaccine like the flu vaccine) has been wholly discredited in the Vaccine Program as unreliable. *See, e.g.*, *J. F. v. Sec'y of Health & Hum. Servs.*, No. 13-799V, 2022 WL 5434214, at *32 (Fed. Cl. Spec. Mstr. Sept. 9, 2022) (discussing weaknesses of ASIA as causation theory/injury).

## IV.     Procedural History

The claim was initiated in August 2022. After the matter's activation, Respondent's Rule 4(c) Report opposing compensation was filed in April 2023. ECF No. 26. I subsequently ordered the filing of expert reports, and Dr. Kinsbourne's report was filed that fall. Respondent's expert report followed in February 2024, and I subsequently offered Petitioner the opportunity to obtain a responsive/supplemental report from Dr. Kinsbourne, but his death in the early spring of 2024 forced Petitioner to attempt to identify a substitute individual.

By October 2024, Petitioner reported that he had been unsuccessful in those efforts, and requested instead a schedule for ruling on the record be established. ECF No. 39. I proposed a schedule to do so. *See* Docket Entry Order, dated October 29, 2024. In the course of briefing, however, Respondent filed a second expert report from Dr. Staud (ECF No. 53-1), leading Petitioner to move to strike it as not in accordance with the scheduling orders I had set. ECF No. 54.[11] Otherwise, the parties completed briefing in August 2025, and the matter is ripe for resolution.

___

[10] The H1N1 virus, or swine flu virus, has had a vaccine developed against it, but it is not the same as the version of flu vaccine covered by the Program (although an H1N1 viral strain is included in the version of the vaccine that is covered). *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, *58 n. 2 (2010), *aff'd*, 420 F. App'x 973 (Fed. Cir. 2011).

[11] That motion is well-founded. The time to file a supplemental expert report had already passed when Respondent filed Dr. Staud's supplemental report. And in a case in which Petitioner's primary expert became unavailable due to death, and where Petitioner was subsequently unable despite due effort to locate another expert, it would work a manifest unfairness on Petitioner to allow Respondent two reports to his one. ***Accordingly, Dr. Staud's Supplemental Report (ECF No. 53-1) is hereby ordered stricken.***

14

## V.    Parties' Arguments

*Petitioner*

Petitioner maintains that he has satisfied his requisite showing that the flu vaccine caused his CFS by a preponderance of the evidence. Mot. at 17. He asserts that his medical records, clinical presentation, diagnostic testing, treatment response, and Dr. Kinsbourne's expert opinion show that he suffers from CFS. *Id*. at 19–20. CFS is an unusual injury and requires a patient's presentation to meet extensive diagnostic criteria before confirming a diagnosis. *Id.* at 19. However, Petitioner affirms that Dr. Kinsbourne's expertise and evaluations provide fair grounds for embrace of the diagnosis. And, even without Dr. Kinsbourne's expert opinion, Petitioner holds that his medical records show he has satisfied the basic diagnostic requirements, since he experienced concomitant symptoms of muscle pain, extended fatigue, lethargy, and headaches. *Id.* at 20.

Petitioner also argues that he has satisfied his causation showing. While the precise physiologic cause of CFS is unknown, the theory for whether the flu vaccine "can cause" CFS is predicated on the vaccine triggering an inflammatory response that results in the over-excitability of neurons in the central nociceptive pathways. Mot. at 20–23. Multiple items of literature filed by the Petitioner support a causal relationship between vaccines and CFS. *Id.* 20–21 (citing Ex. 28 at 32; IOM CFS Report at 15). Studies have shown patients with CFS have experienced "highly attenuated" responses of a class of T helper cell responsible for encouraging the production of proinflammatory cytokines, which creates circumstances necessary for CFS. *Id.* at 23 (citing Broderick at 1209). Vaccines, Petitioner claims, could cause an immediate overproduction of proinflammatory cytokines right after being administered. *Id.* (citing Brenu at 5). Petitioner also adds that case reports and studies have shown CFS developing after vaccination. *Id.* at 20–21 (citing Ex. 28 at 32).

Petitioner next contends that he has shown by a preponderance of the evidence that the flu vaccine "did cause" his CFS, and that his injury occurred within a medically appropriate timeframe. Mot. at 27, 31. Petitioner mostly relies on his medical record to establish a causal relationship between the vaccine and his injury. After his vaccine, Petitioner reported extended headaches, muscle pain, lethargy, and weakness during multiple post-vaccination doctor's appointments. *Id*. at 29–30 (citing Ex. 4 at 813, 823–25, 846–58). Petitioner noted his symptoms started the same day he received the vaccine, and his treating providers attributed his condition to the flu vaccine. *Id.* (citing Ex. 4 at 813, 823–25, 846–58). Providers eventually diagnosed him with CFS based on his post-vaccination symptoms (which contrasted to his pre-vaccine condition). *Id.* at 31 (citing Kinsbourne Rep. at 2). Dr. Kinsbourne's opinion, corroborated by medical literature,

also supports the acceptability of the acute onset of CFS symptoms within hours of vaccination. *Id.* at 32 (citing Kinsbourne Rep. at 9; Ex. 28 at 48).

On Reply, Petitioner sought to rebut Respondent's arguments pertaining to the reliability of Dr. Kinsbourne's opinion and Petitioner's diagnosis. Petitioner conceded that Dr. Kinsbourne had applied outdated CFS diagnostic criteria to diagnose Petitioner in his original report, but this has been corrected. Reply at 3. And the differences in diagnostic criteria were "minimal," and should not affect Dr. Kinsbourne's reliability as an expert. *Id.* Respondent argued that Dr. Kinsbourne's opinion should be given little weight in this matter, but Petitioner pointed to prior vaccine cases where Dr. Kinsbourne was accepted as an expert in cases involving CFS. *Id.* at 1–2 (discussing *LaBounty v. Sec'y of Health and Hum. Servs.*, No. 17-325V; 2020 WL 8768631 (Fed. Cl. Spec. Mstr. Dec. 28, 2020); *Bryan v. Sec'y of Health and Hum. Servs.*, No. 14-898V, 2020 WL 7089841 (Fed. Cl. Spec. Mstr. Oct. 9, 2020)). Dr. Kinsbourne's history with the Vaccine Program and his accepted expertise on a wide variety of injuries only substantiated the weight that should be given to his opinion. *Id.* at 3.

In addition, Petitioner contended that his medical records were inconsistent with Respondent's argument that Petitioner's symptoms were "purely psychological," or related to his underlying psychological diagnoses. Reply at 3. Dr. Panopolous, Petitioner's treating psychologist, determined that Petitioner's pain and other symptoms were associated with another diagnosis rather than one of his previously identified psychological conditions. *Id.* (citing Ex. 4 at 1307). Also, Petitioner's documented pre-vaccination symptoms were not as widespread or significant as those following his vaccination. *Id.*

Lastly, Petitioner relied on his expert's opinion and medical literature to rebut Respondent's argument that Petitioner's general causation theory was insufficient to establish the flu vaccine can cause CFS. Reply at 5. Petitioner's filed studies, case reports, and medical literature articulated a link between the flu vaccine and CFS, and show a temporal association between the two. *Id.* Dr. Kinsbourne's medical opinion in favor of a causal relationship adds further support for Petitioner's theory. *Id.*

*Respondent*

Respondent's opposition begins by arguing that Dr. Kinsbourne's report deserves little evidentiary weight. Opp. at 10–13. His medical specialties did not include CFS (treating, diagnosing, or studying) or anything all that comparable to it. *Id.* at 11. In addition, it has been observed in prior Program decisions from years ago that Dr. Kinsbourne was in the practice of offering opinions unconnected to any current clinical expertise or exposure to the relevant injury in a case. *Id.* at 12–13. Dr. Staud, by contrast, had demonstrated current and up-to-date familiarity with CFS and conditions comparable to it. *Id.* at 13. And Dr. Kinsbourne's methodology was

16

questionable as well, relying on stale CFS diagnostic criteria, and ultimately asserting a theory unmoored from any substantive explanation. *Id.*

Next, Respondent denied that Petitioner's condition met the current diagnostic criteria for CFS. Opp. at 13–16. Dr. Staud, for example, emphasized the lack of evidence of post-exertional malaise. *Id.* at 13–14. In addition, Dr. Kinsbourne had over-relied on 1994 criteria, and thus did not take into account the criteria now applied (and reviewed in detail by Dr. Staud), and did not establish they were satisfied. *Id.* at 14. It was not shown Petitioner's treaters had themselves considered these criteria in evaluating Petitioner. *Id.* And (significantly in Respondent's estimation), the ample evidence that Petitioner's fatigue pre-dated vaccination was contrary to Dr. Kinsbourne's own applied criteria (which deemed the symptoms of CFS to begin before fatigue is evident). *Id.* at 15 (citing Kinsbourne Rep. at 4 ("[t]he concurrent occurrence of four or more of the following symptoms, all of which might have persisted or recurred during 6 or more months of illness *and must have predated the fatigue*") (emphasis added)).

Respondent went on to address the *Althen* prongs, maintaining none were met. Opp. at 16–21.[12] The first prong was unsatisfied by Dr. Kinsbourne's expert report, which was "highly generalized," over-relying on the immune stimulation inherent to vaccination, but without more specific evidence showing how the flu vaccine might cause CFS. *Id.* at 16, 17. The concept of "kindling" hypersensitivity had not been shown to be something vaccines could accomplish, and Petitioner otherwise in his brief had relied more on newly-filed literature not considered in Dr. Kinsbourne's report. *Id.* at 17. In the end, Petitioner's causation theory did not rise above a level of mere plausibility—insufficient to meet the preponderant standard applicable to each *Althen* prong. *Id.* at 18.

The second, "did cause" prong was also unmet, Respondent contended. Opp. at 18–20. While there is record evidence that treaters seemed to allow for the possibility that Petitioner's CFS-like symptoms were vaccine-associated, Program case law notes that "such evidence is not sacrosanct," but instead should be evaluated based on the totality of evidence. *Id.* at 18 (citations omitted). The record in this case revealed many of these statements relied on the mere temporal association between vaccination and Petitioner's reported symptoms, and thus did not reflect reasoned views by medical professionals that an actual/likely association with vaccination existed. *Id.* at 19. Moreover, Petitioner's Anoka treaters linked his pain complaints with long-standing psychologic or medical factors—not vaccine-associated persistent inflammation. *Id.* at 19–20. And the record otherwise did not reveal positive inflammation findings, and held other inconsistencies with Petitioner's contentions. *Id.* at 20.

---

[12] Because the disposition of this case turns on the first two *Althen* prongs, I do not include any discussion of the third prong.

## VI.    Applicable Legal Standards

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.,* 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[13] There is no Table claim for CFS (or anything comparable to it) due to receipt of the flu vaccine.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (*quoting Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352-43 (Fed. Cir. 1999); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

---

[13] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or even a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed.Cir.2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs*, 121 Fed. Cl. 230, 245 (2015), *vacated and remanded*, 844 F.3d 1363 (Fed. Cir. 2017).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1122 (Fed. Cir. 2025); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Demore v. Sec'y of Health & Hum. Servs.*, No. 20-1265V, 2024 WL 4542934 (Fed. Cl. Spec. Mstr. Sept. 26, 2024), *aff'd*, No. 20-1265V, 2025 WL 868902, at *4 (Fed. Cl. Mar. 20, 2025) (rejecting the argument that a petitioner's burden is to prove that a causation theory is *plausible* and instead requiring petitioner to prove the theory by a preponderance of the evidence) (emphasis added). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions

and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.       *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues

20

begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that

21

records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.,* 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie,* 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy,* 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu,* 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.,* 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez,* 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.,* 110 Fed. Cl. 184, 203–04 (2013), *aff'd,* 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns,* 3 F.3d at 417.

C.      *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.,* 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.,* 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.,* 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert,* the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether
> the theory or technique has been subjected to peer review and publication;

22

(3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See*, *e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08-601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.      *Consideration of Medical Literature*

Both parties filed numerous items of medical and scientific literature in this case, but not all such items factor into the outcome of this case. While I have reviewed all the medical literature submitted in this case, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015-5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

## ANALYSIS

## I.      Chronic Fatigue/Chronic Pain and Program Treatment of it as Vaccine Injury

Petitioner's expert has focused on CFS as Mr. Lind's injury, and I will treat it as if that diagnosis has preponderant evidentiary support (despite Dr. Staud's reasoned objections about whether sufficient clinical and testing criteria, and based on prevailing/updated views about those criteria, are met in this case). Kinsbourne Rep. at 9.

Both parties' experts offered reasonable definitions of CFS and its accepted diagnostic criteria. *See, e.g.*, Mot. at 19; Opp. at 14 n. 12–13. The Program has resolved many petitions alleging covered vaccines caused CFS. The majority of relevant reasoned decisions, however, have rejected such claims. *See, e.g.*, *Zamora v. Sec'y of Health & Hum. Servs.,* No. 21-1414V, 2025 WL 1105282, at *5–10 (Fed. Cl. Spec. Mstr. Mar. 19, 2025) (flu vaccine not preponderantly shown to be capable of causing CFS via the biologic mechanism of molecular mimicry); *Kinney v. Sec'y of Health & Hum. Servs.,* No. 18-1522V, 2024 WL 2831616, at *11, 16, 19 (Fed. Cl. Spec. Mstr. May 8, 2024) (flu vaccine not shown to be capable of causing CFS; expert over relied on causation theory specific only to context of narcolepsy); *McCabe v. Sec'y of Health & Hum. Servs.*, No. 13-570V, 2018 WL 3029175 (Fed. Cl. Spec. Mstr. May 17, 2018) (denying entitlement for CFS allegedly caused by flu vaccine); *D'Angiolini v. Sec'y of Health & Hum. Servs.*, No. 99-5788V, 2014 WL 1678145 (Fed. Cl. Spec. Mstr. March 27, 2014) (denying entitlement for adverse reaction, including CFS, allegedly caused by hepatitis B vaccine).

I have also previously evaluated CFS as a vaccine injury, albeit in the context of other vaccines, but not found comparable causation theories to have been preponderantly established. *E.S. v. Sec'y of Health & Hum. Servs*., No. 17-480V, 2020 WL 9076620 (Fed. Cl. Spec. Mstr. Nov.

24

13, 2020), at *45 (petitioner did not establish HPV vaccine is likely causal of CFS), *mot, for review den'd*, 154 Fed. Cl. 149 (2021); *Yalacki v. Sec'y of Health & Hum. Servs.*, No. 14-278V, 2019 WL 1061429, at *38–39 (Fed. Cl. Spec. Mstr. Jan. 31, 2019), *mot. for review den'd*, 146 Fed. Cl. 80 (2019) (hepatitis B vaccine was not shown to be capable of causing CFS); *Johnson v. Sec. of Health & Human Servs.*, No. 14-254V, 2018 WL 2051760 (Fed. Cl. Spec. Mstr. Mar. 23, 2018) (denying entitlement in case alleging CFS caused by HPV vaccination).

At bottom, the special masters have, in this series of reasoned decisions, routinely noted that (a) it is not established that CFS even *is* autoimmune in nature, such that it could be attributed to an aberrant self-attack by the immune system, (b) the proposed theories for how CFS occurs have not been credibly associated with the relevant covered vaccines, and (c) claimants have proposed mechanisms for pathogenesis, like molecular mimicry, that have not reliably been linked to how CFS likely occurs.

Far fewer decisions, by contrast, have deemed CFS to be capable of being caused by vaccination (including the flu vaccine). *See, e.g.*, *Bryan,* 2020 WL 7089841  (flu vaccine found to have caused CFS). But these matters are distinguishable, and/or less persuasive than the many other decisions that have found the theory to lack preponderant support. In *Bryan,* for example, there was particularly strong *Althen* prong two evidence (in the form of reasoned contemporaneous treater opinions) that the petitioner's CFS was likely attributable to vaccination. *Bryan,* 2020 WL 7089841, at * 24–26. And the theory accepted in that case—that vaccination can cause an aberrant inflammatory response, primarily due to prompting production of cytokines by the innate immune system, and resulting in chronic immune dysregulation—is one that has not been since embraced (and reflects arguments about the generalized impacts of vaccination that I have often deemed unreliable or over-general). *Yalacki*, 2019 WL 1061429, at *34. Thus, I do not deem *Bryan* worthy of the same weight as guidance in this case as the many other contrary decisions on the subject (some of which also emphasize epidemiologic evidence undercutting a vaccine-CFS association. *See, e.g.*, *Zamora,* 2025 WL 1105282, at *6–7).

## II.    Petitioner Did Not Carry His Burden of Proof under the *Althen* Test

Assuming Mr. Lind was properly diagnosed with CFS, he has not demonstrated entitlement to damages, because he has not offered sufficient preponderant evidence to meet all of the *Althen* prongs. Below, I discuss those prongs most relevant to my determination.[14]

---

[14] All prongs of the Althen test must be satisfied to grant entitlement. *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 Fed. Appx. 976, 980 (Fed. Cir. 2014).

*Althen Prong One*

The evidence offered in this case does not preponderantly establish that the flu vaccine can likely cause CFS. To substantiate causation, Petitioner relies on a collection of arguments I have encountered numerous times in the Program (and with respect to a wide variety of illnesses or disease conditions), but which are consistently deemed to merit low probative value. For example, Petitioner proposes that the impact of vaccination on the immune system, coupled with evidence that immune dysfunction is involved in CFS, means that receipt of a vaccine could trigger it. But this amounts to the sort of routine "plausibility" argument often advanced—unsuccessfully—in Program cases. *See, e.g.*, *Cerrone*, 146 F.4th at 1122 (Fed. Cir. 2025). It is almost always "plausible" that the understood impact of vaccination on the immune system (vaccines are *designed* to promote an immune response) could spark an aberrant reaction—but this does not mean it is *likely* a given vaccine can cause a particular injury due primarily to this possibility. *Aultman v. Sec'y of Health & Hum. Servs.*, No. 21-1802V, 2025 WL 2401983, at *24–25 (Fed. Cl. July 11, 2025). Thus, the mere fact vaccines encourage transient cytokine production, cause feelings of malaise, or simply stimulate the immune system (albeit in a targeted and limited manner) does not elevate the vaccine into the likely driver of a longer-term disease.

Rather, to preponderantly demonstrate the capacity of a covered vaccine to actually spark a process resulting in a claimed adverse effect, claimants need some mix of proof that builds that case. Of course, the lack of a direct study saying "vaccine x likely causes disease y" is no hindrance to success, if the totality of evidence otherwise makes it likely vaccine causation can occur. But that totality is lacking here.

Petitioner offers, for example, a number of articles that vaguely allude to vaccination as potentially triggering CFS, but without substantiation of the assertion. *See, e.g.*, the IOM CFS Report. Many articles support the contention that cytokine upregulation is observed in patients already suffering from CFS (Hardcastle), or stand for the proposition that vaccination can cause some autonomic changes in relevant patient populations (Perring & Jones, Brenu). But these items of literature do not establish how vaccination would cause CFS at the outset. Other articles seemingly *exclude* the flu vaccine as potentially causal of CFS. *See* Ortega-Hernandez. And case reports filed in this case involved somewhat-distinguishable vaccines (Lynch)—and are otherwise a kind of evidence not given much probative weight in Program matters. *Porter*, 663 F. 3d at 1253–54 (single case studies "d[o]not contain any meaningful analysis about causation"); *Campbell v. Sec'y of Health & Hum. Servs.*, 97 Fed. Cl. 650, 668 (2011) ("[c]ase reports do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value compared particularly to formal epidemiological studies"); *Martinez v. Sec'y of Health & Hum. Servs.*, No. 16-738V, 2022 WL 4844923, at *29 (Fed. Cl. Spec. Mstr. Sept. 9, 2022) ("case reports . . . as a general rule do[] not receive great weight when assessing causation"), *mot. for review den'd*, 165 Fed. Cl. 76 (2023).

I also do not deem Dr. Kinsbourne's opinion to be sufficiently persuasive or rooted in reliable proof to stand as robust proof of causation. Experts can certainly help Program claimants meet their preponderant burden, relying on their personal, hard-earned knowledge of a particular disease or the study of its causes to bridge gaps in medical literature evidence, or to explain a causation process that may be complex. Yet as many as 15 years ago,[15] it was recognized that Dr. Kinsbourne specifically (who even at that time no longer had an active medical practice or research lab, and thus could not invoke his more immediate personal experience with a given neurologic injury when offering expert opinions in Vaccine Program cases) was often offering opinions that clearly exceeded his demonstrated expertise—essentially stringing together propositions based on literature cites he dug up for the case at hand, and then writing the whole thing into a report. *Stone v. Sec'y of Health & Hum. Servs.*, No. 04-1041V, 2010 WL 1848220, at *8 (Fed. Cl. Spec. Mstr. Apr. 15, 2010) (citations omitted), *mot. for review granted on other grounds,* 95 Fed. Cl. 233 (2010). I myself have criticized him similarly, and after hearing him testify in another matter. *See L.M. v. Sec'y of Health & Hum. Servs.,* No. 14-714V, 2019 WL 4072130, at *27 (Fed. Cl. Spec. Mstr. July 23, 2019) ("beyond his neurologic expertise, Dr. Kinsbourne has no demonstrated recent (i.e., in the past twenty years) experience (a) treating pediatric patients, (b) treating individuals of any age with a seizure disorder, or (c) studying seizure disorders and their potential triggers").

Here, Dr. Kinsbourne's report was comparably unpersuasive, for the same general reasons. He clearly was not an up-to-date expert in adult neurologic conditions like CFS at the time he authored his report in this case; had never personally studied the subject, or treated patients with it (certainly not in the final years he was still active as a Program expert); and had no direct, demonstrable experience in the capacity of any vaccine to cause CFS. All he has done in this case is provide the framework of a medical professional for a number of items of literature (coupled with the additional items filed herein by Petitioner directly, which Dr. Kinsbourne of course did not have the opportunity to review or opine upon). Thus, Dr. Kinsbourne's report in this matter did not appreciably advance Petitioner's effort to establish causation.

Even if I cabin off concerns about Dr. Kinsbourne's proficiencies as an expert from the causation opinion he actually offered, however, I do not deem his theory to have set forth a reliable opinion for how CFS could be caused by the flu vaccine. He has embraced the kind of general theory I often reject, in which a claimant contends that (a) vaccine-caused inflammation impacts the innate immune response enough to cause disease, but without the needed connective proof linking a vaccine's expected impact with the injury in question, and/or (b) that evidence of immune

---

[15] I take no pleasure in criticizing Dr. Kinsbourne. For many years in the Program, he was an indefatigable advocate for Vaccine Act petitioners, who often struggle to find competent medical or scientific professionals willing to assist them in these difficult cases. His report in this case, as in many others in which he served, was certainly legible, organized, and offered *some* independent medical and scientific literature to support his contentions, even if the opinion offered exceeded his personal/direct experience.

system dysregulation evident *in the context of existing disease* (during the condition's pendency) means that same immune dysfunction explains its cause. All this does is raise a *plausible* causal explanation for how a vaccine might produce a specific injury. It does not rise to the level of a preponderant showing that the vaccine *likely* does cause the injury—and it is the latter standard that is unmet by Dr. Kinsbourne's otherwise-deficient report.

*Althen Prong Two*

Independent of whether the flu vaccine can cause CFS, the medical record in this case does not support the conclusion that it likely *did cause* Petitioner's condition. First, there is a lack of treater support for an association. Admittedly, some early treaters (even going so far as a month or two post-vaccination) credited Petitioner's self-reported immediate symptoms as vaccine-related, likely based upon the view that they were indicative of a vaccine-associated malaise that many individuals would experience. Ex. 4 at 881–94. This was not unreasonable to propose, as vaccines are known to often cause transient malaise in individuals. *Bielak v. Sec'y of Health & Hum. Servs.*, No. 18-761V, 2023 WL 35509, at *11, 14 (Fed. Cl. Spec. Mstr. Jan. 3, 2023). And certainly treaters took seriously Petitioner's self-reporting of symptoms in the wake of receipt of the vaccine, deeming the temporal association somewhat suspicious.

Eventually, however, the record supports the conclusion that references to a vaccine connection were more reflective of Petitioner's continued reporting than of reasoned treater views that his CFS symptoms were vaccine-associated. Thus, I do not give these treater statements about vaccine association (which themselves are not supported by explanation, and which seem mostly to rely on the temporal association between vaccination and reported onset) much weight in deciding this particular *Althen* prong.

Second, Petitioner's reported reaction may reflect the *anticipated* effects of vaccination rather than something new/acute. As literature filed in this case acknowledges, there is similarity between some of the symptoms vaccination inherently brings on and what patients with CFS experience chronically. Brenu at 548–49. Petitioner has also maintained that he began feeling symptoms the same day as his vaccination, which would be more akin to the expected, transient response. Ex. 4 at 867.

This leads to the third, and arguably strongest, deficiency in Petitioner's contention that the flu vaccine "did cause" his CFS. It is difficult on this record to distinguish expected vaccine malaise from ongoing CFS symptoms. But in attempting to do so, Petitioner's overall medical history—especially pre-vaccination—*must be taken into account*. And that history strongly suggests that Petitioner's CFS was far more likely the product of his long-standing comorbidities than vaccination.

28

The substantial medical history filed in this case clearly establishes that Petitioner experienced multi-factorial, interrelated conditions—some psychological, others somatic—in the years before his receipt of the flu vaccine in September 2020. As well-elucidated by Dr. Staud, some of those psychologic conditions are known to have somatic counterpart symptoms. And many of the symptoms Petitioner reported post-vaccination have counterparts in his pre-vaccination history.[16] Not only does this establish that Petitioner struggled with seemingly-chronic symptoms comparable to what he experienced post-vaccination, but that he obtained counseling both before and after vaccination. And the counseling noted in the record that Petitioner obtained from Anoka and Dr. Panopoulos seems to have resulted in the conclusion that Petitioner's ongoing physical symptoms not only had a psychologic origin, but that the treatment of the psychologic issues had physical benefits for Petitioner. *See* Ex. 4 at 914–19.

Petitioner's briefs, as well as Dr. Kinsbourne's report, have little to say about Petitioner's obvious medical history, and the reasonable likelihood it best explains his alleged CFS. Petitioner's Motion does mention the telemedicine visits with Dr. Panopoulos, but does not discuss why Dr. Panopoulos's assessment of "pain disorder associated with psychological factors and a medical condition," and times when Petitioner's post-vaccination pain was stable or decreased in conjunction with increased physical activity, does not undermine his argument. Mot. at 6, 19–20 (citing Ex. 4 at 935–1187).  Rather, the Petitioner chooses to heavily rely on Dr. Kinsbourne's opinion, coupled with Petitioner's Affidavit, as evidence that the Petitioner's pain did not predate his vaccine. *Id.* at 19–20.

Similarly, Dr. Kinsbourne stated in bare, conclusory form that Petitioner's CFS diagnosis did not overlap with his "extensive list of previous ailments[,]" and that none of his preexisting diagnoses are explanatory as they "are either stable or treated and controlled." Kinsbourne Rep. at 5. This lack of analysis is not credible in a case with such obvious evidence of so many pre-vaccination symptoms likely related to what came later. And it is no defense for Petitioner to say he need not *disprove* alternative explanations. *See Exum v. Sec'y of Health & Hum. Servs.,* No. 21-1513V, 2025 WL 1892440, at *38 (Fed. Cl. May 27, 2025), *mot. for review den'd,* 178 Fed. Cl. 627 (2025), *appeal docketed,* No. 26-1178 (Fed. Cir. Nov. 20, 2025). While this is literally true—the *Althen* test does not obligate Petitioners to preponderantly disprove potential alternative causes—any claimant's prong two showing is weakened by record proof that other factors may better explain a claimant's injury than a purportedly causal vaccine. *Austin v. Sec'y of Health & Hum. Servs.*, No. 05-579V, 2018 WL 3238608, at *27 (Fed. Cl. Spec. Mstr. May 15, 2018), *mot. for review den'd*, 141 Fed. Cl. 268 (2018), *aff'd*, 818 F. App'x 1005 (Fed. Cir. 2020). As a result, special masters appropriately take into account this kind of record evidence when weighing a

---

[16] I note that Petitioner does not in this case allege a significant aggravation claim, in which his CFS (or some other illness/condition) was worsened by vaccination. And I do not find on this record otherwise that such a claim would be tenable.

claimant's prong two success—and it becomes far more difficult to find that a vaccine likely "did cause" an injury when the record abounds in such evidence suggesting other factors were more likely causal.

Here, Petitioner cannot ignore such a record, focusing solely on the flu vaccine while conclusory sweeping aside his total medical history. The record in this case instead suggests that his vaccination was likely only an intervening event in his existing medical course. He experienced the vaccination while *already* suffering from a number of maladies, all of which had entirely different explanations/origins but which could have been causal of his CFS. It is thus on this record highly unlikely the flu vaccine caused Petitioner's symptoms (even if it had a transient impact on his health).

## CONCLUSION

A Program entitlement award is only appropriate for claims supported by preponderant evidence. Here, Petitioner has not made such a showing. Petitioner is therefore not entitled to compensation.

I also hereby GRANT Petitioner's Motion to Strike Respondent's late-filed supplemental expert report. The Clerk of Court is ordered to STRIKE ECF No. 53-1.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[17]

**IT IS SO ORDERED**.

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[17] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.